No. 23-15199

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

SAFARI CLUB INTERNATIONAL, an Arizona nonprofit corporation; UNITED STATES SPORTSMEN'S ALLIANCE FOUNDATION, an Ohio nonprofit corporation; CONGRESSIONAL SPORTSMEN'S FOUNDATION,

*Plaintiffs-Appellants*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellee.*

———————————

On Appeal from the United States District Court for the
Eastern District of California
No. 22-cv-01395

———————————

# BRIEF FOR *AMICUS CURIAE* NATIONAL SHOOTING SPORTS FOUNDATION, INC. IN SUPPORT OF APPELLANTS AND REVERSAL

———————————

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN[*]
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

\* Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation, Inc.*

March 17, 2023

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* National Shooting Sports Foundation, Inc. ("NSSF") is a Connecticut non-profit, tax-exempt, non-stock corporation with its principal place of business in Connecticut. Pursuant to Federal Rule of Appellate Procedure 26.1(a), NSSF certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES........................................................................ iii

STATEMENT OF INTEREST................................................................... 1

INTRODUCTION .................................................................................. 2

BACKGROUND .................................................................................... 5

ARGUMENT ....................................................................................... 10

I.    Section 22949.80 Is Subject To Strict Scrutiny, Not *Central Hudson* ......... 10

    A.    Section 22949.80 Discriminates Against Speech Based on the Viewpoint of the Message and Identity of the Speaker .................... 10

    B.    Section 22949.80 Restricts Noncommercial Speech ......................... 16

        1.    Section 22949.80's definition of "marketing or advertising" captures much more than pure commercial speech......................................................................... 17

        2.    Section 22949.80's restriction on the "placement" of advertisements burdens noncommercial expression supported by advertising revenue ........................... 19

II.    Even Assuming *Central Hudson* Applies, Section 22949.80 Flunks It ....... 22

    A.    Section 22949.80 Does Not Directly Advance Any Substantial Governmental Interest ........................................................ 22

    B.    Section 22949.80 Is Not Narrowly Tailored to Achieve the Government's Asserted Public Safety Interests ................................ 26

CONCLUSION .................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ............................................................................25

*Ass'n of Nat'l Advertisers, Inc. v. Lungren*,
44 F.3d 726 (9th Cir. 1994) ...............................................................22

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) .............................................................................15

*Brown v. Entm't Merchants Ass'n*,
564 U.S. 786 (2011) ..................................................................... 16, 30

*Central Hudson Gas & Electric Corp.*
*v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ......................................................... 3, 17, 22, 26

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ..................................................................... 12, 13

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
657 F.3d 936 (9th Cir. 2011) ........................................................ 26, 28

*Dex Media W., Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) .......................................... 17, 19, 20, 22

*Edenfield v. Fane*,
507 U.S. 761 (1993) ............................................................................23

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) ............................................................................15

*Fla. Bar v. Went For It, Inc.*,
515 U.S. 618 (1995) ............................................................................26

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) ............................................................................23

*Hays Cnty. Guardian v. Supple*,
969 F.2d 111 (5th Cir. 1992) ..............................................................20

*Hunt v. City of Los Angeles*,
　　638 F.3d 703 (9th Cir. 2011) ........................................................... 3, 16

*Iancu v. Brunetti*,
　　139 S.Ct. 2294 (2019) ...........................................................11, 12, 15

*IMS Health Inc. v. Sorrell*,
　　630 F.3d 263 (2d Cir. 2010) ................................................................23

*Junior Sports Mags., Inc. v. Bonta*,
　　No. 2:22-cv-04663 (C.D. Cal. filed July 8, 2022) ................................9

*Lorillard Tobacco Co. v. Reilly*,
　　533 U.S. 525 (2001) .................................................................... *passim*

*Matal v. Tam*,
　　582 U.S. 218 (2017) ..................................................................... 15, 26

*McCutcheon v. FEC*,
　　572 U.S. 185 (2014)..........................................................................25

*Minn. Voters All. v. Mansky*,
　　138 S.Ct. 1876 (2018) .......................................................................11

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
　　142 S.Ct. 2111 (2022) .........................................................................5

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
　　138 S.Ct. 2361 (2018) ................................................................. 12, 13

*R.A.V. v. City of St. Paul*,
　　505 U.S. 377 (1992)..........................................................................15

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
　　487 U.S. 781 (1988)..........................................................................17

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
　　515 U.S. 819, 830 (1995).........................................................5, 11, 12

*Rubin v. Coors Brewing Co.*,
　　514 U.S. 476 (1995)........................................................ 24, 25, 27, 28

*S.O.C., Inc. v. Cnty. of Clark*,
  152 F.3d 1136 (9th Cir. 1998) .......................................................... 16, 18, 20, 22

*Safari Club Int'l v. Bonta*,
  No. 2:22-cv-01395 (E.D. Cal. filed Aug. 5, 2022) ..................................9

*SEC v. Wall St. Pub. Inst., Inc.*,
  851 F.2d 365 (D.C. Cir. 1988) ...................................................... 17, 19

*Shurtleff v. City of Boston*,
  142 S.Ct. 1583 (2022) .....................................................................15

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ................................................................. *passim*

*Thompson v. W. States Med. Ctr.*,
  535 U.S. 357 (2002) ........................................................................30

*Turner Broad. Sys., Inc. v. FCC*,
  512 U.S. 622 (1994) ........................................................................14

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013) ...................................................... 15, 28

**Statutes**

15 U.S.C. §1052(a) ...............................................................................12

AB 2571 §1(a) .......................................................................... 6, 14, 23

Cal. Bus. & Prof. Code §22949.80(a)(1) ........................................ *passim*

Cal. Bus. & Prof. Code §22949.80(a)(2) ........................................ *passim*

Cal. Bus. & Prof. Code §22949.80(a)(3) ......................................10, 11

Cal. Bus. & Prof. Code §22949.80(c).................................................2

Cal. Bus. & Prof. Code §22949.80(c)(4) ...................................... 7, 13

Cal. Bus. & Prof. Code §22949.80(c)(5) ............................................7

Cal. Bus. & Prof. Code §22949.80(c)(6) ................................. 3, 18, 27

Cal. Bus. & Prof. Code §22949.80(e)(1) ...................................................7

Cal. Bus. & Prof. Code §22949.80(e)(3) ...................................................8

Cal. Bus. & Prof. Code §22949.80(e)(4) ...................................................8

Cal. Bus. & Prof. Code §22949.80(e)(6) ...................................................7

Cal. Civ. Code §1714.3 ...........................................................................28

Cal. Pen. Code §25100 ............................................................................28

Cal. Pen. Code §27505 ............................................................................28

Cal. Pen. Code §27510 ............................................................................28

Cal. Pen. Code §27590 ............................................................................24

Cal. Pen. Code §29650 ............................................................................28

Cal. Pen. Code §29700 ........................................................................... 24

**Other Authorities**

Cal. Dep't of Fish & Wildlife, *Statewide R3 Implementation Strategy*
(Dec. 2019), https://bit.ly/3JkaINw ...................................................24

Dustin Gardiner, *California Won't Make It Easy to Obtain Concealed
Carry Licenses, Despite Supreme Court Ruling*, S.F. Chronicle
(June 23, 2022), https://archive.ph/3mBlU .........................................5

Junior Shooters, "About Us," https://www.juniorshooters.net/aboutus/ ................21

Office of Gov. Gavin Newsom, *Governor Newsom Responds to
Supreme Court Decision on Concealed Carry* (June 23, 2022),
https://archive.ph/qg9xv .....................................................................5

Office of Gov. Gavin Newsom, *Governor Newsom Takes Action to
Further Restrict Ghost Guns and Protect California Kids from Gun
Violence* (July 1, 2022), https://archive.ph/Bb7Ke........................ 7, 14

Suppl. Decl. of Andy Fink, *Junior Sports Mags., Inc. v. Bonta*,
No. 22-56090 (9th Cir.), Dkt.8-3 ........................................................21

## STATEMENT OF INTEREST

NSSF is the national trade association for the firearm, ammunition, hunting and shooting sports industry. Formed in 1961, NSSF's mission is to promote, protect, and preserve hunting and shooting sports by providing leadership in addressing industry challenges, advancing participation in and understanding of hunting and shooting sports, reaffirming and strengthening its members' commitment to the safe and responsible sale and use of their products, and promoting a political environment supportive of America's traditional hunting and shooting heritage and firearm freedoms. NSSF's membership includes approximately 10,000 federally licensed manufacturers, distributors, and retailers of firearms, ammunition, and related products; companies manufacturing, importing, distributing, and selling goods and services for the shooting, hunting, and self-defense markets; sportsmen's organizations; public and private shooting ranges; gun clubs; and endemic media. At present, approximately 800 NSSF members are located within California. NSSF serves the interests of its members, which are severely threatened by the specter of liability under the new California speech restrictions challenged in this litigation. NSSF's interest in this case derives principally from the fact, under California Business and Professions Code §22949.80, its members now face liability (and

crippling financial sanctions) merely for promoting the lawful products they manufacture and sell or for advocating the lawful events they sponsor.[1]

## INTRODUCTION

Youth access to firearms is a topic of intense public interest and debate. Millions of Americans favor allowing young people to learn how to safely and responsibly use firearms for lawful purposes such as hunting and sport shooting. Many others have a different view. The statute at issue here—section 22949.80 of the California Business and Professions Code—tilts the playing field sharply in the latter camp's favor by muzzling those in the former camp. Under section 22949.80, "firearm industry member[s]"—a term expansively defined to include not just manufacturers and sellers of "firearm-related products," but practically anyone that "*advocat*[*es*] *for* the purchase, use, or ownership of firearm-related products"—are prohibited from "promoting any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors." Cal. Bus. & Prof. Code §22949.80(a)(1), (c) (emphasis added). Section 22949.80 thus prohibits Americans who advocate in favor of Second Amendment rights from, say, publishing speech extoling the virtues of youth-model firearms, but allows those who advocate against

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2), amicus certifies that all parties have consented to this filing. Pursuant to Rule 29(a)(4)(E), amicus certifies that no party's counsel authored any part of this brief, and no person other than amicus contributed money toward the preparation and submission of this brief.

gun rights to lambast them. This pervasive viewpoint-based discrimination renders section 22949.80 unconstitutional—regardless of whether, as California claims, the statute should be understood to restrict only commercial speech. Indeed, given its sweeping content-based restrictions aimed at particular speakers, section 22949.80 would demand strict scrutiny even if it somehow were deemed viewpoint-neutral.

The district court erred in applying the less stringent standard set forth in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). That standard applies to laws that restrict purely commercial speech—*i.e.*, "speech that does no more than propose a commercial transaction." *Hunt v. City of Los Angeles*, 638 F.3d 703, 715 & n.6 (9th Cir. 2011). Yet that is not all section 22949.80 proscribes. To be sure, section 22949.80 imposes restrictions on advertisements in the classical sense. But its restrictions extend beyond speech *proposing* a commercial transaction to speech that merely *encourages* the purchase of a firearm-related product, including magazine articles that mix political advocacy with enthusiasm for firearms. *See* Cal. Bus. & Prof. Code §22949.80(a)(1), (c)(6). In addition, section 22949.80's restrictions on the mere *placement* of firearm-related advertisements burden the *non*commercial speech of publications that depend on revenue from such advertisements. Section 22949.80 thus on its face restricts more than purely commercial speech, so *Central Hudson* does not apply.

In any event, section 22949.80 cannot survive even *Central Hudson* review. For starters, the statute's restrictions do not directly advance a substantial governmental interest. Minors may lawfully use firearms in California, including for hunting and sport shooting. Indeed, the California Department of Fish and Wildlife *actively encourages youth participation in hunting and sport shooting activities*. *See* 3-ER572-75. California has no interest in preventing such *lawful* possession of firearms, and the new speech restrictions section 22949.80 imposes are unlikely to reduce *unlawful* possession of firearms by individuals who are undeterred by existing criminal penalties. What is more, while California obviously has a strong interest in preventing the use of firearms to commit acts of violence, the purported connection between suppressing firearm-related advertisements and reducing such violence is far from direct. The statute's restrictions are not narrowly tailored to serve the government's asserted interests. The law burdens innocuous marketing, such as a retailer's factual explanation of why a particular rifle or shotgun is well-suited for a teenage hunter or target shooter. Such onerous burdens on speech are not justified; indeed, California's public safety interests could easily (and more effectively) be pursued through speech-neutral means, such as heightened enforcement of existing criminal bans on unlawful gun possession and violence.

While California is of course free to advance its own viewpoints through government speech, the First Amendment forbids "ideologically driven attempts to

4

suppress a particular point of view." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 830 (1995). The decision below should be reversed.[2]

## BACKGROUND

This past June, the Supreme Court held in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S.Ct. 2111 (2022), that the fundamental right the Second Amendment secures is neither second-class nor homebound. *Id.* at 2134-56. California officials wasted no time in voicing strenuous opposition to that decision. *See, e.g.*, Dustin Gardiner, *California Won't Make It Easy to Obtain Concealed Carry Licenses, Despite Supreme Court Ruling*, S.F. Chronicle (June 23, 2022), https://archive.ph/3mBlU. Governor Newsom was particularly strident, lambasting *Bruen* as "reckless" and "radical." Office of Gov. Gavin Newsom, *Governor Newsom Responds to Supreme Court Decision on Concealed Carry* (June 23, 2022), https://archive.ph/qg9xv.

Had California officials left it at that—simply exercising their right to speak out against federal action with which they disagreed—it would have been an exercise in First Amendment freedoms. Indeed, had the state enacted legislation officially

---

[2] Section 22949.80 suffers from additional defects that have not yet been litigated. For example, it directly regulates marketing that takes place entirely in other states and places undue burdens on interstate commerce. *See* Cal. Bus. & Prof. Code §22949.80(c)(5). Similar issues with a California law purporting to regulate out-of-state agriculture are currently before the Supreme Court in *National Pork Producers Council v. Ross*, No. 21-468. Thus, even if this Court affirms, it still should remand the case if Appellants wish to amend their complaint.

condemning *Bruen*, the Second Amendment, and/or the Supreme Court, the government speech doctrine would have protected California's foray into the debate. But that is not what California officials saw fit to do. Instead of exercising their own First Amendment rights or engaging in government speech, California officials enacted legislation that substantially curtails the First Amendment rights of individuals and businesses on the other side of the gun-rights debate. On June 30, 2022, California enacted Assembly Bill 2571, which (among other things not relevant here) adds a new section 22949.80 to the Business and Professions Code.

Although this new legislation purportedly was motivated by a desire to curb the criminal misuse of firearms by minors, *see* AB 2571 §1(a) (declaring in statutory findings that the statute is intended to "ensur[e] that minors do not possess" firearms because of "gun violence" perpetrated by criminal youths), the statute does not regulate the use or misuse of firearms by minors or anyone else. Nor does it impose any obligations or requirements on minors. Instead, section 22949.80 is focused solely on "industry members," ostensibly on the theory that the criminal misuse of firearms by minors is a product of purported efforts to "market firearms to minors"—even though minors are prohibited from purchasing firearms under both federal and California law. *See* Office of Gov. Gavin Newsom, *Governor Newsom Takes Action to Further Restrict Ghost Guns and Protect California Kids from Gun Violence* (July

1, 2022), https://archive.ph/Bb7Ke (admitting that section 22949.80 "directly targets the gun lobby").

Under the new statute, "[a] firearm industry member shall not advertise, market, or arrange for placement of an advertising or marketing communication offering or promoting any firearm-related product in a manner that is designed, intended, or reasonably appears to be attractive to minors." Cal. Bus. & Prof. Code §22949.80(a)(1). The statute applies only to—and proscribes the speech only of— "[f]irearm industry member[s]," a term defined to include not only businesses lawfully "engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products," but also persons and entities that exist to "promot[e], encourage[e], or advocat[e] for the purchase, use, or ownership of firearm-related products" and that engage in the endorsement or sponsorship of firearms, related products, and/or related events. *Id.* §22949.80(c)(4); *see id.* §22949.80(c)(5) (defining "[f]irearm-related product").

Section 22949.80 authorizes state and local attorneys to bring a "civil action" against "[f]irearm industry member[s]" to collect civil penalties of up to $25,000 for each violation, *id.* §22949.80(e)(1), with "[e]ach copy or republication" of the offending speech constituting "a separate violation," *id.* §22949.80(e)(6). It also authorizes "a[ny] person harmed by a violation" to bring a separate "civil action to recover their actual damages." *Id.* §22949.80(e)(3). In either case, a court may grant

"injunctive relief, including a permanent or temporary injunction, restraining order, or other order against the person or persons responsible for the conduct, as the court deems necessary to prevent the harm described in this section." *Id.* §22949.80(e)(4). In other words, the statute authorizes both ex ante and ex post speech restrictions.

Despite its specificity with respect to parties and remedies, the statute is far less clear when it comes to the nature of the speech restrictions it imposes on members of the firearms industry. Section 22949.80 prohibits a firearms industry member from "advertis[ing], market[ing], or arrang[ing] for placement of" such concerning "any firearm-related product in a manner that is designed, intended, or *reasonably appears to be attractive to minors*." *Id.* §22949.80(a)(1) (emphasis added). But the statute nowhere defines what is—let alone what could "*appear*[] *to be*"—"attractive to minors." Instead, it instructs courts to consider "the totality of the circumstances" and lists a handful of non-exclusive factors, including (among other things) whether a product is offered in "colors" that appeal to minors, whether promotional materials contain "depictions of minors," and whether such materials offer any "brand name merchandise for minors," such as "hats, t-shirts, or other clothing." *Id.* §22949.80(a)(2)(B)-(C), (a)(2)(E). Specifically, section 22949.80 provides that, "[i]n determining whether marketing or advertising of a firearm-related product is attractive to minors," "a court shall consider the totality of the

8

circumstances," "including, but not limited to, whether the marketing or advertising":

> (A) Uses caricatures that reasonably appear to be minors or cartoon characters to promote firearm-related products.
>
> (B) Offers brand name merchandise for minors, including, but not limited to, hats, t-shirts, or other clothing, or toys, games, or stuffed animals, that promotes a firearm industry member or firearm-related product.
>
> (C) Offers firearm-related products in sizes, colors, or designs that are specifically designed to be used by, or appeal to, minors.
>
> (D) Is part of a marketing or advertising campaign designed with the intent to appeal to minors.
>
> (E) Uses images or depictions of minors in advertising and marketing materials to depict the use of firearm-related products.
>
> (F) Is placed in a publication created for the purpose of reaching an audience that is predominately composed of minors and not intended for a more general audience composed of adults.

*Id.* §22949.80(a)(2).

Several shooting sports organizations sued to enjoin section 22949.80 shortly after it was enacted. *See, e.g.*, *Junior Sports Mags., Inc. v. Bonta*, No. 2:22-cv-04663 (C.D. Cal. filed July 8, 2022); *Safari Club Int'l v. Bonta*, No. 2:22-cv-01395 (E.D. Cal. filed Aug. 5, 2022). Not long thereafter, California enacted Assembly Bill 160, which amended §22949.80 by adding the following provision:

> This subdivision does not apply to a communication offering or promoting any firearm safety program, hunting safety or promotional program, firearm instructional course, sport shooting event or competition, or any similar program, course, or event, nor does it apply

> to a communication offering or promoting membership in any organization, or promotion of lawful hunting activity, including, but not limited to, any fundraising event, youth hunting program, or outdoor camp.

Cal. Bus. & Prof. Code §22949.80(a)(3) (as amended). Assembly Bill 160 left section 22949.80 otherwise unchanged.

In the decision below, the district court rejected Appellants' challenges to section 22949.80 under the First and Fourteenth Amendments. As relevant here, the district court found that the only "speech which §22949.80 seeks to regulate is commercial speech" and that the statute passes muster under *Central Hudson*.

## ARGUMENT

### I. Section 22949.80 Is Subject To Strict Scrutiny, Not *Central Hudson*.

#### A. Section 22949.80 Discriminates Against Speech Based on the Viewpoint of the Message and Identity of the Speaker.

California Business and Professions Code section 22949.80 treats speech differently depending on the viewpoint the speech conveys. As originally enacted and in its present form, section 22949.80 suppresses speech advocating *for* ("promoting") firearm-related products in a manner "attractive to minors," while allowing speech advocating *against* such products or conveying messages that are designed to make such products appear *un*attractive to minors. Cal. Bus. & Prof. Code §22949.80(a)(1). And in its effort to "fix" the original version of the statute via amendment, California exacerbated the viewpoint discrimination, creating a regime under which members of the firearm industry may convey one state-

10

sponsored viewpoint—firearms can be safely used by minors for hunting and in competitions—but may *not* convey that firearms are useful for self-defense, necessary in modern urban environs, or any other viewpoints, if the speech encourages a firearm purchase and "reasonably appears to be attractive to minors." *Id.* §22949.80(a)(1), (a)(3). To put it in concrete terms, section 22949.80 would restrict the publication of a photo showing a minor holding a rifle above the caption, "This product is perfect for the teenage hunter," but allow the publication of an identical photo captioned, "This product is too dangerous for teens." This sort of differential treatment—restricting expression of certain views on a particular topic while permitting the expression of opposing views on the same topic—is the very definition of viewpoint discrimination. Section 22949.80 thus violates the First Amendment for reasons having nothing to do with *Central Hudson*.

It is "a core postulate" of First Amendment law that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys," *i.e.*, its viewpoint. *Iancu v. Brunetti*, 139 S.Ct. 2294, 2299 (2019). "[V]iewpoint discrimination is an 'egregious form of content discrimination' and is 'presumptively unconstitutional.'" *Id.* (quoting *Rosenberger*, 515 U.S. at 829-30); *see also, e.g.*, *Minn. Voters All. v. Mansky*, 138 S.Ct. 1876, 1885 (2018) ("In a traditional public forum … [speech] restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited."). The Supreme Court recently applied the

viewpoint-neutrality principle to a provision of the Lanham Act, which also regulates speech in the commercial realm. The provision at issue in *Brunetti* "prohibit[s] the registration of 'immoral[] or scandalous' trademarks." 139 S.Ct. at 2297 (quoting 15 U.S.C. §1052(a)). The Court struck down the prohibition as "viewpoint based" because it favored ideas "aligned with conventional moral standards" over ideas "hostile to [those standards]." *Id.* at 2300. For example, the statute barred registration of trademarks "conveying approval of drug use," such as "KO KANE," while permitting registration of trademarks opposing drug use, such as "D.A.R.E. TO RESIST DRUGS AND VIOLENCE." *Id.* Section 22949.80 is no different.

In fact, it is even more problematic. In addition to prohibiting laws that treat certain viewpoints less favorably than others, the First Amendment generally forbids "restrictions distinguishing among different speakers, allowing speech by some but not others." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *see also Rosenberger*, 515 U.S. at 828 ("In the realm of private speech or expression, government regulation may not favor one speaker over another."). "Speaker-based laws run the risk that 'the State has left unburdened those speakers whose messages are in accord with its own views.'" *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S.Ct. 2361, 2378 (2018) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580, 564 (2011)). Accordingly, "[the Supreme] Court's precedents are deeply skeptical of laws that 'distinguis[h] among different speakers, allowing speech by some but

not others.'" *Id.* (quoting *Citizens United*, 558 U.S. at 340); *see also, e.g.*, *Sorrell*, 564 U.S. at 558-59, 564 (holding that a Vermont law prohibiting pharmaceutical companies from using information about individual doctors' prescribing practices for marketing purposes, but allowing other uses, was viewpoint discriminatory because it "burden[ed] disfavored speech" (*i.e.*, marketing) "by disfavored speakers" (*i.e.*, pharmaceutical companies)).

Here, California has imposed speech restrictions only on "firearm industry member[s]," Cal. Bus. & Prof. Code §22949.80(a)(1)—a term the statute defines to include not just manufacturers and sellers of firearms, but all who "*promot*[*e*] … the purchase, use, or ownership of firearm-related products." *id.* §22949.80(c)(4) (emphasis added). Left unburdened, by contrast, are the myriad speakers who *oppose* the purchase, use, or ownership of firearm-related products. The resulting differential treatment smacks of viewpoint discrimination that has nothing to do with commerce. Under section 22949.80, NSSF and its members are barred from "copying or republi[shing]" advertisements such as those found at 2-ER212, 2-ER216, 2-ER219, 2-ER224-30, and 2-ER232-35, but the Violence Policy Center is free to continue copying and republishing the exact same advertisements in its "Start Them Young" report, which advocates for an unqualified prohibition on "the acquisition, possession, and use of firearms by children," 2-ER250. That is quintessential viewpoint discrimination: It "reflect[s] the Government's preference

13

for the substance of what the favored speakers have to say" and "aversion to what the disfavored speakers have to say," *Turner Broad. Sys., Inc. v. FCC,* 512 U.S. 622, 658 (1994), which the First Amendment does not tolerate.

If there were any doubt that section 22949.80 targets expression of disfavored viewpoints, the legislative record eliminates it. *Cf. Sorrell*, 564 U.S. at 565 (reviewing legislative findings and record to confirm viewpoint discrimination). The author of section 22949.80 has repeatedly touted it as "[t]aking away [a] tool of violent indoctrination from the gun industry." *E.g.*, 2-ER188 (Senate Floor Analysis of AB 2571). Other legislative materials similarly confirm that the law was intended to suppress speech that might "encourag[e] children to use firearms"—which, as noted at the outset, *is lawful in California*. 2-ER144 (Assembly Judiciary Committee Analysis of AB 2571); *see also, e.g.*, AB 2571 §1 (asserting that California "has a compelling interest in ensuring that minors do not possess [firearms]"); 2-ER135 (Assembly Judiciary Committee Analysis of AB 2571) (statute targets speech that could "entice" minors "to be interested in possessing and using firearms"); 2-ER168-69 (Senate Judiciary Committee Analysis of AB 2571) (similar); *cf.* Office of Gov. Gavin Newsom, *Governor Newsom Takes Action to Further Restrict Ghost Guns and Protect California Kids from Gun Violence* (July 1, 2022), https://archive.ph/Bb7Ke (describing the law as designed to "directly target[] the gun lobby"). In short, section 22949.80 is the California government's

"attempt to give one side of a debatable public question an advantage in expressing its views." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785-86 (1978).

This viewpoint discrimination renders the statute unconstitutional whether or not it restricts purely commercial speech. *Brunetti* provides a recent illustration of the correct analysis. The Supreme Court there invalidated the Lanham Act's ban on "immoral" or "scandalous" trademarks as viewpoint discriminatory without deciding whether it regulated "pure commercial speech." 139 S.Ct. at 2299; *see id.* at 2305 (Sotomayor, J., concurring). While *Central Hudson* review may be appropriate for some content-based restrictions on commercial speech,[3] viewpoint-based restrictions are never permissible, except when the government "speak[s] for itself." *Shurtleff v. City of Boston*, 142 S.Ct. 1583, 1593 (2022); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 387-89 (1992); *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 71-72 (1983); *Matal v. Tam*, 582 U.S. 218, 251 (2017) (Kennedy, J., concurring). The First Amendment flatly forbids legislative attempts to suppress "the *ideas* expressed by speech—whether it be violence, or gore, or racism"—even for "speech directed at children." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786,

---

[3] This Court has held that "[t]he proposal of an illegal transaction is … categorically exempted from First Amendment protection," *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 822 (9th Cir. 2013), but section 22949.80 is not narrowly aimed at proposals of illegal transactions (*e.g.*, sales to minors); it sweeps in broad swathes of speech encouraging *lawful* firearm purchases. *See infra* Part II.

794-95, 799 (2011) (invalidating California law banning rental or sale of certain violent video games to minors). Because section 22949.80 discriminates on the basis of viewpoint, this Court's inquiry should begin, and end, there.

### B. Section 22949.80 Restricts Noncommercial Speech.

There is a second, independent reason why *Central Hudson* is inapposite: Section 22949.80 restricts both commercial and noncommercial speech—and under binding Supreme Court and Ninth Circuit precedent, *Central Hudson*'s less stringent standard applies only where "*all* speech hampered by [the challenged statute] is commercial." *Sorrell*, 564 U.S. at 571 (emphasis added); *see, e.g.*, *S.O.C., Inc. v. Cnty. of Clark*, 152 F.3d 1136, 1142-44 (9th Cir.), *amended*, 160 F.3d 541 (9th Cir. 1998) (*Central Hudson* test does not apply where a statute restricts both commercial and noncommercial speech); *Hunt*, 638 F.3d at 715 & n.6 (same).

Section 22949.80 restricts noncommercial speech in at least two ways. First, its broad definition of "advertising or marketing" captures much more than pure "commercial speech" as the Supreme Court has defined that term. Second, its restriction on the "placement" of firearm-related advertisements burdens the noncommercial speech of publications that rely on such advertisements. Accordingly, even if section 22949.80 did not discriminate on the basis of viewpoint, it still would be subject to strict scrutiny as a regulation of "mixed-content" speech. *See Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 957-62 (9th Cir. 2012).

### 1. Section 22949.80's definition of "marketing or advertising" captures much more than pure commercial speech.

"[I]t is important that the commercial speech doctrine not be defined too broadly lest speech deserving of greater constitutional protection be inadvertently suppressed." *Id.* at 961 (quoting *Central Hudson*, 447 U.S. at 579 (Stevens, J., concurring)). In light of that concern, courts have consistently held that the permissive *Central Hudson* standard does not apply to "mixed-content speech such as [newpapers,] magazines[,] or televised political debates." *Id.* For example, the D.C. Circuit has held that magazine articles that encourage readers to invest in particular companies, generate revenue from those companies, and "uniformly portray the subject firm as an appealing investment prospect" are *not* "commercial speech." *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 366-67, 372 (D.C. Cir. 1988). Similarly, this Court held in *Dex Media* that the "yellow pages" phone directory enjoys full First Amendment protections—and that regulations imposing conditions and costs on distribution of the yellow pages are subject to strict scrutiny—even though "portions of [it] are obviously commercial in nature." 696 F.3d at 954; *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988) ("[E]ven assuming … that [regulated] speech in the abstract is indeed merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech.").

Here, section 22949.80 goes well beyond restricting "speech which does *no more* than propose a commercial transaction." *S.O.C., Inc.*, 152 F.3d at 1143. On its face, the statute regulates speech that does not propose a transaction, but merely "encourage[s] recipients" to buy a firearm or related item. Cal. Bus. & Prof. Code §22949.80(c)(6) (emphasis added). This sweeps far more broadly than the Supreme Court's definition of "commercial speech," restricting expression such as magazine articles containing favorable reviews of firearm-related products as well as pro-Second Amendment advocacy. The record contains several examples:

- A 2012 article in *Junior Shooters* magazine titled "Mossberg's Tactical AR .22," authored by a twelve-year-old reader of the magazine, "recommend[s] buying" the Mossberg .22 rifle. 2-ER226. Given the statute's broad definition of "Marketing or advertising," *see* Cal. Bus. & Prof. Code §22949.80(c)(6), the article almost certainly "advertise[s]" the firearm in a manner "attractive to minors" within the meaning of the statute. *See id.* §22949.80(a)(2)(C), (E), (F), (c)(6). But much of its content does not "propose a commercial transaction"; the author describes how he earned the money for his rifle, what he likes about its design and features, and how he and his dad modified it in ways that have helped improve his aim. 2-ER226.

- A 2014 *NRA Family* article titled "Test Fire: Thompson/Center HotShot" reviews a "single-shot .22 LR-cal. rifle" designed for "six to 12-year-old[s]." 2-ER236 (full article available at https://bit.ly/3JKbxQZ). The article encourages readers to purchase the HotShot, makes clear that the product is designed for minors, and displays a photo of a minor holding it. *Cf.* Cal. Bus. & Prof. Code §22949.80(a)(2)(C), (E), (c)(6). But significant portions of the article are devoted to noncommercial speech, including discussion of consumer demand for "kid-sized" firearm products, analysis of how the Hotshot differs from other "youth model" firearms, and commentary on the value of introducing children to hunting at an early age.

18

- A 2015 *Shooting Sports Retailer* article titled "The Best Guns For Small Shooters" encourages firearm retailers to "provide products well-suited to young shooters." 2-ER222. The article not only encourages commercial transactions involving specific firearms designed to be used by minors, *cf.* Cal. Bus. & Prof. Code §22949.80(a)(2)(C), but also advances a political argument that engaging young people in the shooting sports is critical to preserving Second Amendment rights. *See* 2-ER226.

Articles like these are within section 22949.80(c)(6)'s broad definition of "advertising or marketing," but not the Supreme Court's narrow definition of "commercial speech." While such articles encourage commercial transactions involving firearm-related products, they "are not in an advertisement format" and contain significant amounts of noncommercial expression, such that "it would be difficult to draw a doctrinal line between [them] and any article that focuses on a particular [product]." *Wall St. Pub.*, 851 F.2d at 372. Under this Court's (and the Supreme Court's) precedents, such "mixed-content" speech is entitled to full First Amendment protection, and content-based restrictions on such speech are subject to strict scrutiny, not the *Central Hudson* test. *See Dex Media*, 696 F.3d at 960-62.

### 2. Section 22949.80's restriction on the "placement" of advertisements burdens noncommercial expression supported by advertising revenue.

In addition, full First Amendment protections (not *Central Hudson*) apply when commercial speech is "inextricably intertwined" with noncommercial speech, as is the case in publications that fund noncommercial speech by running paid advertisements. *See id.* at 963-64; *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 120

(5th Cir. 1992). In other words, the First Amendment protects the right "to distribute noncommercial expressive material containing some form of advertising." *Dex Media*, 696 F.3d at 964 (quoting *S.O.C., Inc.*, 152 F.3d at 1144)). After all, the vast majority of publications containing fully protected speech on matters of public concern—including newspapers, magazines, television shows, and radio programs—are for-profit ventures that rely on advertising revenue.

Section 22949.80 places onerous burdens on magazines and similar publications by restricting not only advertisements themselves but also the "placement of … advertising or marketing" in expressive publications. *See* Cal. Bus. & Prof. Code §22949.80(a)(1), (a)(2)(F). Before the enactment of section 22949.80, advertisements for firearm-related products regularly appeared in publications containing noncommercial expression about minors lawfully using firearms to hunt and participate in shooting sports. *See, e.g.*, 3-ER-373-74 (Cassidy Decl. ¶¶12-13); 3-ER-387 (Crane Decl. ¶14); 3-ER-429 (Heusinkveld Decl. ¶13); 3-ER-379-81 (excerpts from "Safari Times" magazine); 3-ER471, 3-ER478-80 (excerpts from "Sportsman's Advocate" magazine); 3-ER544-59, 3-ER551 (excerpts from "Conservation Adventures" magazine). The statute restricts this practice, as merely "plac[ing]" a firearm-related advertisement in proximity to a photo or article about minors—particularly minors using firearms—could make the advertisement "appear[] to be attractive to minors," Cal. Bus. & Prof. Code §22949.80(a)(1).

Speakers like Appellants have been forced to remove noncommercial photos and articles about minors' lawful use of firearms from their publications because of the threat of crippling financial penalties under section 22949.80(e).  *See, e.g.*, 3-ER-374 (Cassidy Decl. ¶15); 3-ER-429 (Heusinkveld Decl. ¶¶14-15).

What is more, section 22949.80 effectively bans any magazine or website focused on promoting lawful youth participation in hunting and shooting sports. Unsurprisingly, a publication such as *Junior Shooters*—which has existed for more than 15 years and is dedicated to "promot[ing] juniors involved in all shooting disciplines"—is made economically possible by firearm-related advertisements. Suppl. Decl. of Andy Fink ¶7, *Junior Sports Mags., Inc. v. Bonta*, No. 22-56090 (9th Cir.), Dkt.8-3 at 182-83 ("Fink Decl."); *see also* Junior Shooters, "About Us," https://www.juniorshooters.net/aboutus/.  But because section 22949.80 forbids the "placement" of firearm-related advertising "in a publication created for the purpose of reaching an audience that is predominantly composed of minors," the statute's enactment has forced *Junior Shooters* not only to cease all distribution of its magazine in California, but to place warnings on its website to deter minors in California from entering the site.  Fink Decl. ¶3.  The First Amendment does not allow California to drive publications out of circulation by preventing them from running ads for lawful products just because the publications promote messages the state dislikes.  *See Dex Media*, 696 F.3d at 964; *see also Ass'n of Nat'l Advertisers,*

*Inc. v. Lungren*, 44 F.3d 726, 731 (9th Cir. 1994) (courts must ensure that restrictions on commercial speech do not "collaterally stifle more privileged speech").

*   *   *

In sum, *Central Hudson* is inapposite here because "the plain language [of section 22949.80] does not limit the scope of the regulated activity to purely commercial expression." *S.O.C., Inc.*, 152 F.3d at 1143. To the contrary, the statute directly restricts mixed-content speech that encourages firearm-related transactions while conveying other messages and burdens the noncommercial speech of publications that rely on firearm-related advertisements. Section 22949.80's content-based speech restrictions demand strict scrutiny.

## II.  Even Assuming *Central Hudson* Applies, Section 22949.80 Flunks It.

In all events, section 22949.80 cannot withstand even *Central Hudson* review. Under *Central Hudson*, the government must demonstrate that a restriction on speech (1) directly advances a "substantial" governmental interest and (2) is "narrowly drawn" to achieve the desired objective. 447 U.S. at 564-65. As detailed below, California fails to carry its burden on either element.

### A.  Section 22949.80 Does Not Directly Advance Any Substantial Governmental Interest.

Under the first *Central Hudson* requirement, "[a] regulation cannot be sustained if it 'provides only ineffective or remote support for the government's purpose' … or if there is 'little chance' that the restriction will advance the state's

22

goal." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 566 (2001) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770 (1993), and *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 193 (1999)).  This direct-advancement requirement is not a walkover.  In *Sorrell*, for example, the government asserted that burdening pharmaceutical companies' receipt of speech would make their marketing less effective, resulting in doctors writing fewer prescriptions for name-brand drugs, thereby reducing healthcare costs and protecting public health, *see IMS Health Inc. v. Sorrell*, 630 F.3d 263, 277 (2d Cir. 2010), but the Supreme Court held that this causal chain was too indirect to satisfy *Central Hudson*, *see Sorrell*, 564 U.S. at 577.

Here, California relies on two allegedly "compelling interest[s]" identified by the General Assembly: "ensuring minors do not possess [firearms]"; and "protecting its citizens, especially minors, from gun violence and intimidation by persons brandishing these weapons."  2-ER113 (quoting AB 2571 §1).  Section 22949.80 does not directly and materially advance either interest.

First, the legislature's asserted interest in "ensuring minors do not possess" firearms is puzzling—to put it mildly—because California law expressly *permits* minors to possess firearms when engaging in, or in direct transit from, a lawful recreational sport such as competitive shooting or hunting.  *See* Cal. Pen. Code §29615; *see also id.* §27505 (permitting an adult to loan a firearm to a minor for such lawful recreational purposes).  Indeed, as noted above, a California agency

actively encourages minors' use of firearms through its hunter-recruitment marketing strategy. *See generally* Cal. Dep't of Fish & Wildlife, *Statewide R3 Implementation Strategy* (Dec. 2019), https://bit.ly/3JoZNlB. The state has no cognizable interest in preventing minors' *lawful* possession of firearms. And a regulatory scheme in which the state permits (and even encourages) minors to possess firearms, but simultaneously suppresses private speech in an effort to prevent such lawful possession, "makes no rational sense." *Cf. Rubin v. Coors Brewing Co.*, 514 U.S. 476, 488 (1995) (holding that similarly irrational regulatory scheme failed "direct advancement" prong of *Central Hudson*).

Perhaps recognizing this, the district court reframed the legislature's stated interest as "ensuring that minors do not *unlawfully* possess dangerous weapons." 1-ER024 (emphasis added). But California law already provides criminal sanctions for minors who unlawfully possess firearms, as well as adults who unlawfully transfer firearms to minors. *See* Cal. Pen. Code §§27590, 29700. It is difficult to see how restricting speech encouraging *lawful* commercial transactions involving firearm-related products will meaningfully reduce *unlawful* possession of firearms by individuals who are undeterred by existing criminal penalties. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 506 (1996) (plurality op.) (marginal price increase associated with ban on advertising retail prices of alcoholic beverages was unlikely to deter *abusive* consumption of alcohol). In all events, the state has

provided no evidentiary support for this dubious proposition. *See id.* at 505-06 (requiring evidentiary support under similar circumstances); *Lorillard Tobacco*, 533 U.S. at 566 (rejecting unsupported theory that forbidding tobacco advertisements posted within five feet of the ground would curb minors' demand for tobacco products). California's "prophylaxis-upon-prophylaxis approach," *McCutcheon v. FEC*, 572 U.S. 185, 221 (2014) (plurality op.), thus fails at the threshold.

As for protecting citizens from violence, that of course is a substantial governmental interest—but it is doubtful that section 22949.80 advances it, and it is certain that it does not do so directly. Ironically, the opinion below highlights the indirect nature of the government's theory: "[I]t is likely that a restriction on firearm advertising directed towards minors will lead to a reduction in the demand for firearms by minors, it follows that there will be fewer firearms in the hands of minors, and, as 'simple common sense' dictates, fewer instances of gun violence— whether intentional or unintentional—involving minors." 1-ER025. This type of indirect suppression of speech is exactly what *Central Hudson* forbids. *See Rubin*, 514 U.S. at 486-87. The government may not attempt to reduce gun violence "through the indirect means of restraining certain speech by certain speakers," *i.e.*, by silencing truthful speech about lawful firearm-related products. *Sorrell*, 564 U.S. at 577. Accordingly, section 22949.80 fails the first *Central Hudson* requirement.

**B.** **Section 22949.80 Is Not Narrowly Tailored to Achieve the Government's Asserted Public Safety Interests.**

The final element of the *Central Hudson* test requires the government to demonstrate that the restriction on speech is "narrowly tailored to achieve the desired objective." *Lorillard Tobacco*, 533 U.S. at 556 (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 632 (1995)). "This means, among other things, that '[t]he regulatory technique may extend only as far as the interest it serves.'" *Matal*, 582 U.S. at 245 (quoting *Central Hudson*, 447 U.S. at 565). Statutes that are overinclusive—*i.e.*, those that restrict more speech than necessary to serve the government's asserted interest—do not pass muster. *See, e.g.*, *id.* at 246 (ban on "disparaging" trademarks restricted speech that would not actually disrupt commerce); *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 948-50 (9th Cir. 2011) (en banc) (ban on soliciting employment, business, or contributions from occupant of any motor vehicle restricted speech that did not actually threaten traffic or safety).

Here, section 22949.80 restricts broad swathes of speech that are not related to unlawful firearm possession, much less unlawful firearm use. For example, section 22949.80 forbids firearm retailers from explaining why a particular firearm is well-suited to a teenager's lawful, recreational activity and thus prevents parents whose children participate in such activities from receiving this important information. *See supra* pp.17-19 (detailing section 22949.80's suppression of product reviews). The statute restricts other innocuous content that is likely

26

"attractive" to both adults and minors, such as an advertisement depicting a minor using a firearm under adult supervision with the caption, "Still one of the great connections that a smart phone can't provide." 2-ER216 (capitalization altered). What is more, section 22949.80 appears to forbid retailers from conveying basic product descriptions about youth-model firearms that they lawfully sell. For example, the "product description for a .22 Bushmaster AR-15 model at the Gander Mountain Sports website" reproduced at 2-ER219 states that the product is "[d]esigned for … the youth shooter" and encourages the reader to purchase it because it will "add new dimensions to your Bushmaster shooting pleasure." Under California's blunderbuss new law, all of this speech (and much more) is now a punishable offense. *See* Cal. Bus. & Prof. Code §22949.80(a)(1), (a)(2)(C), (a)(2)(D), (c)(6). The statute is thus far too capacious to pass muster even under *Central Hudson*.

Section 22949.80 is insufficiently tailored for another reason too: The state obviously and inarguably could "advance [its] asserted interest in a manner less intrusive to … First Amendment rights." *Rubin*, 514 U.S. at 490-91. The Supreme Court has held that a prohibition on beer labels displaying alcohol content is not narrowly tailored to the government's goal of "preventing brewers from competing on the basis of alcohol strength," as that goal could be advanced by direct limitations on alcohol content as well as more targeted restrictions on advertisements

"emphasizing high alcohol strength" or labeling of only malt liquor. *Id.* at 485, 490-91. Similarly, in *Redondo Beach*, this Court invalidated an ordinance restricting solicitation of motorists because the City could advance its traffic safety interests through more robust enforcement of existing traffic regulations that burdened little or no speech. *See* 657 F.3d at 949-50. Here, of course, a number of existing laws directly protect California's asserted public safety interests. *See, e.g.*, Cal. Pen. Code §§25100 (criminalizing storage of firearm accessible to child), 27505, 27510 (restricting sale, loan, or transfer of firearm to minors), 29610 (restricting possession of firearm by minor), 29650 (restricting possession of live ammunition by minor); Cal. Civ. Code §1714.3 (imposing liability on parent or guardian for injury caused by discharge of firearm by minor). The obvious, speech-neutral way to combat unlawful firearm possession and use is through more robust enforcement of these existing laws—for example, by devoting more resources to preventing and prosecuting violations or imposing heightened penalties on offenders. *See, e.g.*, *Redondo Beach*, 657 F.3d at 949-50; *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 827 (9th Cir. 2013). And to the extent commercial speech encouraging minors to unlawfully purchase or use firearms actually occurs and presents a public safety issue—despite the utter lack of evidence on this point—the legislature could always enact a (much) narrower restriction on speech that actually targeted that problem.

*See* 2-ER141 (comment on draft bill suggesting narrower prohibition on "advertising the illegal sale of firearms to minors").

Finally, section 22949.80's speech restrictions "unduly impinge on the speaker's ability to propose a commercial transaction and the adult listener's opportunity to obtain information about products." *See Lorillard Tobacco*, 533 U.S. at 565. In *Lorillard Tobacco*, the challenged regulations (which prohibited outdoor advertising of smokeless tobacco or cigars within 1,000 feet of schools or playgrounds) *did* directly and materially advance the government's "compelling" interest in "preventing underage tobacco use," but the Supreme Court nevertheless held that they failed "narrow tailoring" because they imposed "particularly onerous burdens" on communications between tobacco retailers and adults wishing to lawfully purchase and use tobacco products. *Id.* at 556-61, 564-66. Section 22949.80 imposes far greater restrictions on speakers' ability to propose commercial transactions and consumers' ability to obtain information than in *Lorillard Tobacco*. There, the ban was limited to outdoor advertising in particular geographic locations; here, the ban extends to *any* "advertising or marketing communication"—whether oral, online, or in print. *See* Cal. Bus. & Prof. Code §22949.80(a)(1). There, the ban covered only speech *proposing* a commercial transaction; here, the ban extends to a broader category of speech *encouraging* firearm-related transactions. *See* Cal. Bus. & Prof. Code §22949.80(c)(6). The government's purported justification for its

onerous restrictions here is also much weaker than the justification advanced in *Lorillard Tobacco*. There, the regulations targeted a product that was unlawful for minors to use under any circumstances, and the FDA had compiled extensive evidence that limiting youth exposure to tobacco advertising would decrease underage use of tobacco. *See Lorillard Tobacco*, 533 U.S. at 556-61. Here, by contrast, minors may lawfully use firearm-related products for hunting and sport shooting, and the asserted connection between truthful speech about such products and unlawful firearm use is tenuous at best. *See supra* pp.24-25.

For these reasons, section 22949.80 fails *Central Hudson*'s "narrow tailoring" requirement. Indeed, the statute's lack of tailoring "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown*, 564 U.S. at 802.

California is of course free to express its own viewpoint on firearms and to directly regulate firearms in a manner consistent with the Second Amendment and other constitutional guarantees. But it may not "prevent[] the dissemination of truthful commercial information" in an attempt "to prevent members of the public from making bad decisions with the information." *See, e.g.*, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002).

## CONCLUSION

This Court should reverse the decision of the district court.

Respectfully submitted,

<u>s/Erin E. Murphy</u>

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN*
JOSEPH J. DEMOTT
CLEMENT & MURPHY, PLLC
706 Duke Steet
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

\* Supervised by principals of the firm who are
members of the Virginia Bar

*Counsel for* Amicus Curiae *National Shooting Sports Foundation*

March 17, 2023

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and Circuit R. 32-1 because this brief contains 6,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

March 17, 2023

<u>s/Erin E. Murphy</u>
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on March 17, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy